IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

FEB - 8 2016

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

MICHAEL MATTHEWS )
REG.NO.01080-052 )
USP McCREARY )
POST OFFICE BOX 3000 )
PINE KNOT,KY,42635, )
    Petitioner, )
)
   v. )      Civil Action No.
)
ATTORNEY GENERAL LORETTA )
E. LYNCH )
UNITED STATES DEPARTMENT )
OF JUSTICE )
950 PENNSYLVANIA,AVE,N,W., )
WASHINGTON,D.C.20001, )
    Respondent. )

RECEIVED
FEB - 8 2016
Clerk, U.S. District and
Bankruptcy Courts

RECEIVED
Mail Room
FEB - 5 2016
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW The Petitioner,Michael Matthews,acting pro se.,respect-
fully moves this Court pursuant to Title 28 U.S.C.Section 2241,
for a writ of habeas corpus.

### JURISDICTION

1.The petitioner invokes this Court personal juridiction.  The
federal habeas corpus statute provide that the proper respondent
to a habeas petition is the person who has custody over the
petitioner.  See Rumsfeld v.Padilla,124 S.Ct.2711,2717(2004)(
quoting 28 U.S.C.2242(2000).  See also 28 U.S.C.2243(2000)("the
writ of habeas corpus ..shall be directed to the person having
custody of the person detained").  Rumsfeld v.Padilla,supra,
124 S.Ct.at 2717(quoting Wales v.Whitney,114 U.S.564,574 (1985)).
Accord Rasual v.Bush,124 S.Ct.2686,2695(2004)("the writ of habeas
corpus does not act upon the petitioner who seeks relief,but upon

the person who holds him in what is alleged to be unlawful
custody"(quoting Braden v.30th Judicial Circuit Court of Ky.,
410U.S.484,494-95(1973).  See Abu Ali v.Ashcroft,350 F.Supp.
2d 28,44(D.D.C.2004("when the petitioner and his immediate
custodian are outside the territory of any district court...
petitioner may name as respondent custodians(not just the
immediate custodians)(and may file the claim in the court
that has jurisdiction over those respondents).

## PARTIES

2. The Petitioner,Michael Matthews,is a prisoner presently
incarcerated at a federal prison for a commitment of a court
of the United States of America.  Address Post Office Box 3000,
Pine Knot,Ky,42635.

3.  The respondent is Loretta E Lynch/United States Attorney of
United States of America/Department of Justice who has custody
over the petitioner unlawfully. Her address at United States
Department of Justice/950 Pennsylvania,Ave,N.W.,Washington,D.C.
20001.

## STATEMENT OF THE CASE

4. The petitioner was indicted by a grand jury on November 10,2005,
in the Northern District of New York on the following counts. Count
One Conspiracy,and Count Two Bank Robbery.  A jury trial commenced
on September 6,2006,the petitioner was found guilty on both counts
in the indictment by jury.     On February 21,2007,the petitioner
was sentenced to two concurrent terms of life imprisonment.  A
timely notice of appeal was filed on the petitioners behalf. On
October 7,2008,the United States Court of Appeals for the Second
Circuit affirmed the appeal.  See United States v.Matthews,454
F.3d 223(2d Cir.2008).

Thereafter, the petitioner filed a pro se.,collateral attack pursuant to Title 28 U.S.C.Section 2255,to vacate,set aside,or correct his sentence.   On July 23,2009,the district court denied the petitioners motion. The petitioner sought for a Certificate of Appealability ("COA"),from the district court,the court granted the petitioner motion for a ("COA"). The Second Circuit Court of Appeals,and remanded the case back to the district court with instructions to allow the petitioner to proceeds with his 2255, pleadings.  See Matthews v. United States,682 F.3d 180,184-85( 2d Cir.2012).  The district court vacated the bank robbery count, and affirmed the conspiracy count.  A timely notice of appeal was filed.   Thereafter,the Second Ciruit Court of Appeals dismissed the appeal.

## REASONS FOR GRANTING THE WRIT

5.The petitioners conviction of conspiracy is a unlawful conviction where the remedy of Title 28 U.S.C.Section 2255,is inadequate or ineffective remedy for actually innocent where the petitioner conviction based on a incorrect understanding of the law.  See In re Smith,285 F.3d 6,8(D.C.Cir.2002).  The enactment of Title 28 U.S.C.,which challenges collateral attacks by federal prisoners to the sentencing court(rather than to the court of the district of confinement).  The petitioner invokes this court personal jur- isdiction over the respondent.  Significantly,Section 2255,as originally enacted and as amended by the AEDPA,contain an explicit exception to the general rule that a federal prisoner must use 2255,instead of seeking a writ of habeas corpus on behalf of a prisoner who is authorized to apply for relief by motion pursuant to 28 U.S.C.Section,2255,shall not be entertained if it appears that the prisoner has failed to apply for relief,by motion to court which sentenced him,or that such motion is inadequate or

ineffective to test the legality of his detention.

6. The petitioner asserts an exemption of the explicitness to the general rule and proceed by way of habeas courpus pursuant to Title 28 U.S.C.Section 2241,where the district of conviction incorrect understanding of the law by remaining the conviction of conspiracy where the district of conviction vacated the bank robbery.  In the district of conviction decision vacating the bank robbery,where it state in relevant parts:

> In fact,there was a wealth of information in the defense file that should have prompted further investigation into Matthews' location before, the robbery began.  A September 27,2003,the police report,authored by Detective J.Blumer, documents a conversation the detective had with Nathaniel Holloway,the owner of Holloway's garage.  This report indicates that King Williams,who worked at the garage at approximately 11:25 a.m.,on the day of Syracuse robbery.  In September 30,2003, statement to police,King Williams claimed that he observed Matthews at Holloway's garage at "around 11:30 a.m."  This is reflected in an October 1,2003,police report,which noted:  "Williams stated that a little after 1130hrs. Matthews came back to the shop again in the van.

> Further,according to the notes of Detective Blumer,John Smith reported that "11:30/11:45." This account is documented in an October 5,2003,police report,which reflected: "Smith admitted did come back to the shop at 521 South Ave."

> These estimates by King Williams and John Smith are entirely consistent with the two timelines prepared by Matthews, who established that he arrived back at Holloway's garage between 11:35 a.m.,and 11:45 a.m. that day.  This information becomes important in light of Valerie Sewall's police statement and her trial testimony.  Sewall's police statement as a key witness reported that Matthews picked her up at her apartment on Delhi Street and drove to his apartment on East Kennedy Street to pick up the blue Toyota-

sedan.    See Attached <u>Exhibit A</u>.hereto.

7.    The remedy of Section 2255,is "inadequate and ineffective" to test the illegality of his detention,where the district of conviction has incorrect understanding the law of the conspiracy statute.   Commonsense demonstrates on the above mentioned by the district of conviction that the petitioner conviction based upon wrongful information from the government witness Sewall    that the petitioner robbed the bank do to the district of conviction own factual finding conclude that the allegations of Sewall's was fabricated,and due to this fabrication the petitioner is actually innocent of conspiracy. This court can draw inference from the court of conviction where it states in relevant parts:

> <u>    This information becomes  </u>
> <u>important in light of Valerie's Sewall's</u>
> <u>police statement and her trial testimony.</u>
> <u>Sewall's reported that Matthews picked</u>
> <u>her up at her apartment on Delhi  Street</u>
> <u>and drove up to his apartment   on East</u>
> <u>Kennedy Street to pick up the blue  </u>
> <u>Toyota sedan.</u>

See <u>Ex.A.</u>

The district of conviction conclusion that the above mentioned never occurred.  An understanding of "actual innocence" can be derived from <u>Bousley v. United States,523 U.S.614,623,118 S.Ct.</u> <u>1604,140 L.Ed.2828(1998)</u>.  "To establish actual innocence,petitioner must demonstrate that,in light of all the evidence,it is more likely than not that no reasonable juror would have convicted." [1]    It is important  to note in this regard that 'actual innocence' means factual innocence,not mere legal insufficiency. In other words,the respondent is not limited to the existing record to rebut any showing

---

[1] The court of conviction failed to grant the petitioner a new trial, based upon the court vacated the bank robbery,in order for the petitioner to adjudicate the alleged conspiracy before a jury  trial to establish what the district of conviction has establish that there was no conspiracy.  A reasonable jury  would have found the petitioner not guilty of conspiracy.  The petitioner is being illegal held in detention.

that petitioner might make . The respondent should be permitted
to present admissible evidence of the petitioner's guilt.   Id.at
623-24,118 S.Ct.1604.   The petitioner is factually innocent of the
violation of the conspiracy statute where it state in relevant
parts:

> 371. Conspiracy to
> commit offense or to defraud
> United States
> If two or more persons conspire
> either to commit any offense
> against the United States,or
> to defraud the United States. 2/

The bank robbery vacated under the above mentioned statute gover-
ning conspiracy to conspire to bank robbery is a incorrect under-
standing of the law.   In the district of conviction own admission
that the petitioner is actual innocent of the bank robbery based
upon sufficient evidence in support thereof,and the fabrication
of the only witness of the government.   The plain language of the
statute  clearly demonstrates if two or more persons conspire.
Petitioner counters that he has been convicted and being punish
for conduct that the law prohibits.   The petitioners Due Process
Rights under the Fifth Amendment,in violation because the incar-
ceration for a act that do not constitute a crime is patently
offensive to the Constitution.The remedy of Title 28 U.S.C.Section
2255,is inadequate and ineffective where the petitioner invokes
the saving clause Title 28 U.S.C.Section 2255(e),where the petitio-
ner has been denied a reasonable opportunity to obtain a reliable
judicial determination of the fundamental legality of  his conviction,

---

2/  2)13. Bank Robbery incidential crimes: Where it state in relevant
parts: (a) Whoever,by force and violence, or by intimidation,take or
attempts to takes from the person or presence of another or obtain
by extortion any other thing of value belongs to,or in the care,
control,management,or possession of,any bank.

because the district of conviction in its own admission that the respondents witness provided fabricated information that the petitioner robbed the bank, that there is a wealth of evidence in contradiction that the petitioner is actually innocent of the bank robbery. The existed interpretation of statutory law establishes that the petitioner is actually innocent in which the district of conviction had failed to afford the petitioner a 'full and fair' opportunity to present his actual innocence of conspiracy before a jury trial.
3/
  372/and 2113, creates a distinct criminal offense where the evidence at the petitioners trial that the petitioner had conspired with the respondents witness to rob a bank. Through the petitioners alleged accomplice liability in this context was fabricated before the court.

Despite the fact of the district of conviction factual finding, and incorrect understanding of the law on the petitioners conviction for conspiracy. This court must consider whether that a serious due process question would arise if congress were to close off all avenues of redress in this case, especially when the petitioner raised his claims in the district of conviction of innocence, and the district of conviction own admission that the conspiracy between the petitioner, and the alleged accomplice never conspired with one another, because the petitioner is actually innocent of the bank robbery. This court must allow the petitioner to proceed with a **WRIT OF HABEAS CORPUS**.

_____

3/ The petitioner has been denied  of his Fifth Amendment Right to a jury trial after the district of conviction vacated the bank robbery, and affirmed the conspiracy count. The bank robbery count was vacated due to evidence that petitioner was not the perpetrator of the bank robbery. Due to this factual finding, the alleged conspiracy to rob the bank, a jury would not have found the petitioner guilty of the conspiracy count. Petitioner was originally charged in the indictment with bank robbery, thereafter the respondent filed a superseding indictment charging the petitioner with the conspiracy count.

## CONCLUSION

WHEREFORE, the petitioner prays that this Court order that the respondent to show cause why this writ of habeas corpus   should not be granted.


Respectfully Submitted

*Michael Matthews*

Michael Matthews
Reg.No.01080-052
USP McCreary
Post Office Box 3000
Pine Knot,Ky,42635


## CERTIFICATE OF SERVICE

I,HEREBY STATES that the foregoing Petition for Writ of Habeas Corpus.  Was mailed to the Clerk Office/United States District Court for the District of Columbia.  On this _3rd_,day _February_ ,2016:

-8-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

    -v-                               5:05-CR-519

MICHAEL MATTHEWS,

            Petitioner–Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

OFFICE OF JEFFREY R. PARRY        JEFFREY R. PARRY, ESQ.
Attorney for Petitioner
7030 East Genesee Street
Fayetteville, NY 13066

HON. RICHARD S. HARTUNIAN       EDWARD R. BROTON, ESQ.
United States Attorney                   Asst. United States Attorney
Northern District of New York
100 South Clinton Street
P.O. Box 7198
Syracuse, NY 13261

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

On September 11, 2006, a jury found petitioner–defendant Michael Matthews

("petitioner" or "Matthews") guilty of conspiracy to commit bank robbery ("Count 1") and

committing a bank robbery on September 25, 2003, at a Fleet Bank in Syracuse, New York

("the Syracuse robbery") ("Count 2"). In Count 1, the overt acts alleged to have been

committed by Matthews and his co-conspirator(s) in furtherance of the conspiracy included

the Syracuse robbery; an October 15, 2003, robbery at a Fleet Bank in Whitesboro, New York ("the Whitesboro robbery"); and a December 11, 2003, robbery at an M&T Bank in Auburn, New York ("the Auburn robbery"). Matthews pleaded guilty to the Whitesboro and Auburn robberies in state court before the trial began in this case.

On February 21, 2007, petitioner was sentenced to concurrent terms of life imprisonment on each count, pursuant to the three-strikes sentencing law, 18 U.S.C. § 3559(c)(1)(A)(i).[1]  The United States Court of Appeals for the Second Circuit affirmed the convictions and sentence on October 7, 2008. United States v. Matthews, 545 F.3d 223 (2d Cir. 2008) (per curiam).  The Second Circuit specifically held that petitioner's prior convictions and his conviction on Counts 1 and 2 in this matter constituted "serious violent felonies" for purposes of the three-strikes law. Id. at 228.

Thereafter, Matthews filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In this motion, he raised an ineffective assistance of counsel claim based on his trial attorney's use of an allegedly biased investigator. This motion was denied in its entirety on July 23, 2009, and petitioner appealed.

On June 14, 2012, the Second Circuit issued a decision vacating the July 23, 2009, Order "to the extent that it summarily rejected Matthews's claim of ineffective assistance of trial counsel due to the alleged conflict of interest of the investigator hired by counsel." Matthews v. United States, 682 F.3d 180, 184–85 (2d Cir. 2012). In accordance with the Second Circuit's decision and subsequent Mandate, the July 23, 2009, Order was vacated to

---

[1]  Matthews had previously been convicted of several serious violent felonies, beginning in 1971 when he was adjudicated a youthful offender following robbery and burglary convictions. In 1983 he was convicted of robbery in New York state court. See People v. Matthews, 68 N.Y.2d 118 (1986). He was also convicted of bank robbery and conspiracy to commit bank robbery in federal court in 1993. See United States v. Matthews, 20 F.3d 538 (2d Cir. 1994).

the extent it denied petitioner's ineffective assistance of counsel claim based on the allegedly

biased investigator, Attorney Jeffrey R. Parry was assigned to represent petitioner in regard

to that claim, and an evidentiary hearing was scheduled to determine: (1) was the

investigator biased; (2) what evidence an unbiased investigator could have discovered in

order to create a reasonable probability that the result of the trial would have been different;

and (3) was petitioner's attorney ineffective.

The hearing was conducted on September 10 and 11, 2013, in Utica, New York. At

the conclusion of the hearing, the parties were afforded time to review the transcript of the

proceeding and submit proposed findings of fact and conclusions of law. Those submissions

have been received and reviewed with the transcript. The following are the Findings of Fact

and Conclusions of Law required by § 2255(b).

## II. FINDINGS OF FACT

The following pertinent facts have been gleaned from documents filed on the docket,

the trial transcript and exhibits, and the transcript of and exhibits received at the recent

evidentiary hearing.

### A. The 1982 Arrest

Richard Haumann was a deputy chief of the Syracuse Police Department in 1982.

This position ranked him as the third in command of the department. In September 1982,

Matthews and an accomplice robbed a bar in Syracuse at gunpoint. While fleeing the scene,

Matthews allegedly fired three shots at a Syracuse police officer. He was arrested and

charged with the robbery and attempted murder of the officer. However, prior to trial, he was

mistakenly released from custody and remained at large for approximately three months.

Law enforcement searched for him in what police and local media described as "one of the

- 3 -

most extensive manhunts in the city's history." Hr'g Ex. D-30.

While conducting surveillance in the early morning hours of December 26, 1982, Haumann and another officer observed Matthews leave a residence in Syracuse disguised in women's clothing and a wig. Haumann personally tackled and arrested Matthews as he attempted to flee.[2] At the subsequent criminal trial, which took place in October 1983, Haumann testified about his role in the arrest. Matthews was found not guilty of the attempted murder charge.

Deputy Chief Haumann retired from the Syracuse Police Department in 1986. In 1999, he began working as an investigator for the Office of the Federal Public Defender in Syracuse. He will hereinafter be referred to as "Investigator Haumann."

### B. The 2003 Syracuse Robbery and Trial

At approximately noon on September 25, 2003, Valerie Sewall[3] and a male accomplice robbed the Fleet Bank on West Seneca Turnpike in Syracuse. Sewall entered the bank first, completed a minor transaction, and left. The male accomplice entered later, completely disguised from head-to-toe, and initiated the robbery. Images from the bank's surveillance camera show Valerie Sewall in the bank at 11:49 a.m. and the male accomplice at 12:10 p.m. The male accomplice could not be positively identified by the images. Eyewitness accounts and subsequent police investigation place his estimated height at five feet, seven inches.

On November 10, 2005, an indictment was filed in the Northern District of New York

---

[2] At the September 2013 hearing, Matthews testified that during the arrest, Haumann punched him in the head, slammed his face into the ground, and stated: "Nigger, you don't think we work holidays?" Hr'g Tr., Sept. 10–11, 2013, ECF No. 135, 18:8–10 ("Hr'g Tr.").

[3] It is undisputed that Sewall participated in the Syracuse, Auburn, and Whitesboro robberies.

charging Matthews with one count of bank robbery related to the Syracuse robbery.

Assistant Federal Public Defender David G. Secular ("Attorney Secular") appeared on behalf

of Matthews on November 21, 2005. A superseding indictment containing Counts 1 and 2

was filed on April 20, 2006. Around this time, Investigator Haumann was assigned to work

on Matthews's defense case with Attorney Secular.[4] Federal Public Defender Lisa A.

Peebles replaced Attorney Secular as Matthews's counsel on June 30, 2006. Assistant

Federal Public Defender James F. Greenwald ("Attorney Greenwald") replaced attorney

Peebles on July 24, 2006. Attorney Greenwald served as Matthews's counsel throughout the

trial, which began on September 5, 2006, continued on September 6 and 7, and concluded

on September 11, when the jury returned a verdict of guilty on Counts 1 and 2.

At the trial, the Government called John Smith as a witness. He testified that on the

morning of the Syracuse robbery, Matthews picked him up at Holloway's garage in Syracuse.

He noted that Matthews was driving a white van at the time. They reportedly drove to an

auto auction in Cicero, New York, where they purchased a used blue Toyota Corolla sedan.

According to Smith, he and Matthews stopped at a gas station to put gasoline in the Toyota,

then dropped the blue sedan off at Matthews's apartment on East Kennedy Street in

Syracuse. Smith further testified that Matthews then dropped him off back at Holloway's

garage between 11:00 a.m. and 11:10 a.m. Matthews then left the area in the white van.

The Government's main witness at the trial was Valerie Sewall, who testified that she

---

[4] At the September 2013 hearing, Matthews described an April 2006 meeting between him and
Attorney Secular. During their meeting, Attorney Secular introduced Haumann as the investigator assigned to
Matthews's case. Matthews reports that Haumann stated: "Oh, I know Mike" and made a reference to "gang
tackling" him. Hr'g Tr. 29:7, 81:14–19. He further testified that after Haumann left the room, he informed
Attorney Secular that Haumann had arrested him in the past for attempted murder of a Syracuse police
officer.

and Matthews drove around central New York in late-2002 and early-2003 casing banks. She identified petitioner as her accomplice in the Syracuse, Auburn, and Whitesboro robberies. She specifically claimed that on the morning of the Syracuse robbery Matthews picked her up at her apartment in a white van. She testified that they drove from her apartment on Delhi Street in Syracuse to an apartment building on East Kennedy Street to pick up a second car, a blue sedan. They then drove the two vehicles to a school parking lot near the Fleet Bank on Onondaga Hill, where she reportedly helped petitioner smear black shoe polish on his face and put on a mask, hat, and gloves. She testified that she then drove the blue sedan from the parking lot to the Fleet Bank as Matthews rode in the reclined passenger seat.

Sewall next reported that she entered the bank alone to determine how many employees were working. She completed a minor transaction, exited the bank at approximately 11:50 a.m., and reported back to Matthews in the parked blue sedan. According to Sewall, Matthews then entered the bank and committed the robbery. She claims that he soon exited the bank and she drove them back to the school parking lot, where they abandoned the blue sedan, got back into the white van, and fled. She testified that they drove to an unknown garage on the south side of Syracuse, split up the money, drove to a corner store near her apartment, and then Matthews dropped her off at her apartment on Delhi Street. On cross-examination by Attorney Greenwald, Sewall estimated that approximately twenty-five (25) to thirty-five (35) minutes passed between the time Matthews exited the bank after the robbery and the time she arrived back at her apartment.

Finally, Sewall informed the jury that she and Matthews were apprehended as they fled the Auburn robbery in December 2003. During her direct examination, she identified a

- 6 -

letter Matthews had written and given to her after their arrest. This letter contained a version of the events surrounding the Auburn robbery that she was supposed to provide to detectives. This version exonerated Matthews and instead identified a different man as her accomplice. On cross-examination, Sewall acknowledged that she initially lied to the Cayuga County Court about her involvement in the Auburn robbery. She further conceded that she cooperated with the investigating officers to secure her release from jail and to avoid being charged with the Syracuse robbery.

During the defense's case, Attorney Greenwald acknowledged that Matthews committed the Auburn and Whitesboro robberies with Sewall, but argued that he did not commit the Syracuse robbery with her. He argued that Matthews was elsewhere at the time of that robbery. Attorney Greenwald called one alibi witness at trial, Joanne Vaughn. She testified that Matthews had borrowed her white van the night before the Syracuse robbery. She further reported that, on the day of the robbery, he returned the white van to her office on West Castle Street in Syracuse while she was watching the news on television. A television listing for that day indicated that the news program ran from noon to 12:30 p.m. Vaughn denied seeing any shoe polish on Matthews's face. She further testified that Matthews remained in her office for approximately ten to fifteen minutes, at which time she dropped him off at an unidentified location where his pickup truck was parked.

On cross-examination, Vaughn confirmed that Matthews picked up her white van one evening and returned it the following day, but acknowledged that she was not certain of the exact dates on which this occurred. She also identified a statement she gave to police on October 7, 2003, in which she claimed Matthews had picked up her white van on a Thursday

the trial. He provided the first timeline to Investigator Haumann and Attorney Secular at the earliest stages of his criminal case. See Hr'g Ex. D-9. This document outlined his actions and whereabouts on the day of the Syracuse robbery. According to this version of the events, Matthews—driving Joanne Vaughn's white van—picked up John Smith that morning at Holloway's garage in Syracuse and drove to an auction in Cicero, New York. At the auction, they bought a used blue Toyota sedan, filled it up with gasoline at a nearby Byrne Dairy gas station, and proceeded to Valerie Sewall's apartment on Delhi Street, where they left the blue sedan between 10:45 a.m. and 10:50 a.m.

Matthews then stopped at his East Kennedy Street apartment, his Comstock Avenue residence,[6] and then returned to Holloway's garage between 11:35 a.m. and 11:40 a.m. Thereafter, he drove to Joanne Vaughn's workplace on Castle Street, arriving between 11:45 a.m. and 11:50 a.m. He and Vaughn then drove to Vee Harris's house on West Borden Avenue at approximately 12:10 p.m., and then Vaughn dropped Matthews off at his apartment on East Kennedy Street between 12:20 p.m. and 12:30 p.m. Finally, according to this initial timeline, Matthews returned to Holloway's garage between 12:30 p.m. and 12:40 p.m., and then went back to his East Kennedy Street apartment at approximately 12:50 p.m.

The second timeline, which Matthews gave Attorney Greenwald prior to trial, contains a more detailed account of the stops he made on the morning and early afternoon of September 25, 2003. See Hr'g Ex. D-23. It contains similar, but not identical, time approximations as the first timeline. According to this account, after dropping the blue Toyota sedan off at Valerie Sewall's apartment and stopping at his East Kennedy Street

---

[6] At that time, Matthews's permanent residence was on Comstock Avenue, but he was temporarily living at an apartment on East Kennedy Street due to a restraining order.

apartment and Comstock Avenue residence, Matthews returned to Holloway's garage at approximately 11:40 a.m. and briefly spoke with John Smith and dropped off some items. He left Holloway's shortly thereafter and drove to Joanne Vaughn's workplace on Castle Street, arriving between 11:50 a.m. and noon.

Vaughn and Matthews left Castle Street and proceeded to Vee Harris's house to drop off paperwork, arriving between 12:10 p.m. and 12:20 p.m. Vaughn then dropped Matthews off at his East Kennedy Street apartment between 12:20 p.m. and 12:30 p.m. Finally, at approximately 12:30 p.m. John Smith arrived at Matthews's apartment, driving a separate car that Matthews had loaned him earlier in the day. Matthews dropped Smith off at Holloway's garage between 12:40 p.m. and 12:50 p.m. and returned to his apartment.

The Government correctly points out that Matthews's hearing testimony conflicts somewhat with the events as detailed in both timelines. For example, he testified that after leaving his Comstock Avenue residence he drove directly to Joanne Vaughn's workplace on Castle Street, and then he and Vaughn stopped briefly at Holloway's garage to drop off some items. This conflicts with the timelines, which suggest he dropped the items at Holloway's and briefly spoke with John Smith before proceeding to Vaughn's workplace. Further, he claimed that when Joanne Vaughn dropped him off at his East Kennedy Street apartment, Cherry Love–Duncan was waiting for him. He reportedly drove Ms. Love–Duncan in his pickup truck to Valerie Sewall's residence to look at the blue Toyota sedan, which Ms. Love–Duncan was interested in buying. However, they left the area after fifteen minutes because neither the blue sedan nor Valerie Sewall was present. This conflicts with the timelines, which indicate Matthews drove John Smith back to Holloway's garage after Joanne Vaughn dropped him off at his apartment. Neither timeline mentions Cherry Love–Duncan.

- 10 -

### 2. **Investigator Richard Haumann**

At the hearing, Investigator Haumann acknowledged being present at the 1982 arrest, but he could not definitively state whether he personally arrested Matthews. He recalled, however, that he spotted Matthews walking down the street wearing women's clothing. He also reported that in his twenty years with the Syracuse Police Department, this was the only time a detainee had been mistakenly released from custody. He acknowledged that this event would have been particularly noteworthy since Matthews was charged with attempting to kill a police officer. In fact, when asked about other notable cases involving the murder or attempted murder of a police officer, he immediately recalled a 1966 case in which two Syracuse police officers had been killed.

Investigator Haumann further testified that when he became involved with Matthews's defense case in 2006, he recalled arresting Matthews on a fugitive warrant in the past. In fact, he and Matthews discussed the fact that Haumann had arrested him once. However, Haumann claims he did not recall the circumstances surrounding that arrest. He reports that he did not recall the specific circumstances of the 1982 arrest until reading a newspaper article after the Second Circuit's decision had been issued in June 2012. He stated that he did not believe the mere fact that he arrested Matthews in the past presented a conflict of interest. The Office of the Federal Public Defender did not provide him with any training regarding conflicts of interest.

Investigator Haumann similarly could not recall whether he alerted Attorneys Secular or Greenwald to the fact that he had previously arrested Matthews. He opined that "[h]ad I known at that time that it involved a police officer, attempted murder of a police officer, I would have told Mr. Greenwald." Hr'g Tr. 139:19–21. Although Investigator Haumann could

recall discussing the case with Attorney Greenwald, he was unable to recall the content of
those conversations.

According to Investigator Haumann's hearing testimony, his investigation into
Matthews's defense included analyzing a 911 recording, performing a time study regarding
Matthews's alleged travel around Syracuse after the robbery, speaking with Matthews, and
interviewing Joanne Vaughn. He noted that he was not aware of the circumstances
surrounding Matthews's alibi defense when he performed the time study. He could not recall
seeing the two timelines created by Matthews or even talking to him about his activities on
the day of the robbery. However, an April 4, 2006, memorandum he authored suggests he
had a conversation with Matthews about the content of the timelines. See Hr'g Ex. D-8.

### 3. **Attorney James Greenwald**

According to Attorney Greenwald, Matthews, Investigator Haumann, and Attorney
Secular never mentioned the 1982 arrest during the course of his involvement in this case.
He reportedly knew that Matthews and Haumann recognized each other from a prior
interaction, but he did not inquire into the circumstances of that prior interaction. He claimed
that he first learned of the 1982 arrest after the Second Circuit remanded this § 2255 petition
in 2012.

In preparation for trial, Attorney Greenwald directed Investigator Haumann to conduct
a time study regarding the alleged post-robbery route of travel through Syracuse described
by Valerie Sewall. He also personally spoke with Joanne Vaughn and Vee Harris. Further,
he learned that while Valerie Sewall and Cherry Love–Duncan were incarcerated together
Sewall reportedly told Love–Duncan that "she would do anything and lie to anybody she
needed to save her own hide, and she didn't care what happened to Mike." Hr'g Tr.

- 12 -

207:15–17.

Attorney Greenwald and Matthews discussed whether to call Joanne Vaughn, Vee Harris, and/or Cherry Love–Duncan as witnesses at the trial. Ultimately, Joanne Vaughn was the only witness called due to credibility and consistency problems with Vee Harris and Cherry Love–Duncan. They also discussed whether Matthews should testify in his own defense. Matthews deferred to his attorney's recommendation against taking the stand in light of his extensive criminal history.[7]

### 4. Attorney David Elkovitch

Attorney David Elkovitch represented Matthews during the state criminal proceedings stemming from the Auburn robbery. He testified about the numerous misrepresentations made by Valerie Sewall to the Cayuga County Court regarding her involvement in that robbery. She initially denied having any involvement, but later admitted that she was the person who went into the bank in disguise, handed the teller a threatening note, and fled with the money.

### 5. Cherry Love–Duncan

Cherry Love–Duncan testified that, on the day of the Syracuse robbery, she arrived at Matthews's East Kennedy Street apartment after noon. According to her, Matthews and Joanne Vaughn arrived in a white van as she was leaving a note on his pickup truck. She and Matthews then drove in his truck to the north side of Syracuse in an attempt to view a used car he had purchased that morning. However, the car was not there, so Love–Duncan took a bus home shortly thereafter. She testified that she provided this information to

---

[7] Moreover, the undersigned advised Matthews, in open court during the trial, that it was his right to remain silent or testify. Matthews represented that he understood and voluntarily chose not to testify.

- 13 -

Attorney Secular, but was never further contacted by defense counsel.[8]

### 6. Gabriel Ramos

Gabriel Ramos, a private investigator retained by defense counsel for purposes of the

September 2013 hearing, performed a time study related to Matthews's alleged travel just

before the Syracuse robbery started. Specifically, he drove from Holloway's garage (541

South Avenue) to Valerie Sewall's apartment (204 Delhi Street) to Matthews's apartment

(104 Kennedy Street)[9] to the school parking lot near the bank (Onondaga Hill Middle School)

and, finally, to the Fleet Bank on Seneca Turnpike. He reported that this route took

approximately thirty-eight (38) minutes to complete.

### III. CONCLUSIONS OF LAW

As explained at the beginning of the September 2013 hearing, the relevant inquiries

are whether Investigator Haumann was biased against Matthews, whether Attorney

Greenwald was aware of Investigator Haumann's bias, what evidence an unbiased

investigator could have uncovered that Investigator Haumann failed to discover, and whether

Attorney Greenwald made a reasonable investigation separate from Investigator Haumann's

efforts. The ultimate issue is whether Attorney Greenwald's overall representation fell below

an objective standard of reasonableness and, if so, whether such prejudiced Matthews.

---

[8] It is unclear whether Love–Duncan spoke with Attorney Secular before the trial in this case. She testified that the conversation could have occurred any time between 2006 and 2008. She also identified a letter she wrote to Attorney Secular and a notarized statement she authored. Hr'g Exs. G-4, G-5. The letter discussed events surrounding the Auburn robbery and is dated December 6, 2006. The statement, dated April 23, 2008, memorializes her version of the events that occurred on September 25, 2003. Both of these documents were created after Matthews was convicted in this case and therefore could not have been discovered by Investigator Haumann or Attorney Greenwald prior to trial.

[9] Ramos noted that he drove to 107 West Kennedy Street. It is undisputed that Matthews's apartment was located at 107 East Kennedy Street. Defense counsel claims these locations are equidistant from the cross-street, suggesting the error did not skew the results of the time study.

## A. Ineffective Assistance of Counsel—Legal Standard

In order to establish that he was deprived of his Sixth Amendment right to effective assistance of counsel, Matthews must show:  (1) Attorney Greenwald's performance was objectively unreasonable and (2) that he was prejudiced by his attorney's sub-standard representation.  Strickland v. Washington, 466 U.S. 668, 690–92 (1984).  When considering the first prong, courts are reminded of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Further, "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance."  United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting Strickland, 466 U.S. at 689).

Defense counsel also has a duty to investigate, which "requires [him] 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  United States v. Caracappa, 614 F.3d 30, 46 (2d Cir. 2010) (quoting Strickland, 466 U.S. at 691).  This duty "does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense, or 'to scour the globe on the off-chance something will turn up.'"  Id. at 47 (internal citations omitted) (quoting Rompilla v. Beard, 545 U.S. 374, 383 (2005)).  Instead, "counsel may draw a line when they have good reason to think further investigation would be a waste."  Id. (internal quotation marks omitted).

With respect to the second prong of Strickland, petitioner must establish a reasonable probability that the outcome of the proceeding would have been different but for his attorney's errors.  Strickland, 466 U.S. at 694; see also Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009), cert. denied, Brown v. Rock, 130 S. Ct. 1881 (2010).  "[A] 'reasonable

- 15 -

probability' of a different result is a 'probability sufficient to undermine confidence in the outcome.'" Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 694).

### 1. **Investigator Haumann's Conflict of Interest**

The fact that Investigator Haumann arrested Matthews in 1982 for the attempted murder of an officer under his command unquestionably presents a conflict of interest in relation to his subsequent work on Matthews's defense case in 2006. Regardless of whether then-Deputy Chief Haumann used excessive force and hurled racial slurs at Matthews during the arrest, the very fact that the arrest occurred presents a conflict—especially in light of the nature of the charges, Haumann's position in the Syracuse Police Department at the time, his role in the extensive months-long manhunt and arrest, his participation as a witness in the criminal trial, and the fact that Matthews was acquitted of the attempted murder charge.

Neither Attorney Greenwald nor the Government seriously contend that this history between Haumann and Matthews did not present a potential conflict. At the hearing, Investigator Haumann conceded that had he immediately recalled the specific details of the 1982 arrest when he first began working on Matthews's defense case, such would have amounted to a conflict of interest. See Hr'g Tr. 141:3–8. The Government instead invites the Court to simply ignore this conflict because Investigator Haumann did not recall the details of the 1982 arrest until after the trial. That invitation is declined. Indeed, the premise of that argument—that Investigator Haumann somehow did not remember arresting a man disguised in women's clothing who he believed had fired three shots at a Syracuse police officer and then been inadvertently released back into society, triggering the largest manhunt in the city's history—is completely incredible. When asked whether he arrested anyone else

for either murdering or attempting to murder a fellow police officer, Investigator Haumann immediately recalled a 1966 arrest related to the murder of two officers.

Nor is Attorney Greenwald's ignorance of the 1982 arrest excusable. Matthews and Investigator Haumann both testified that they immediately realized Haumann had arrested Matthews in the past. According to Investigator Haumann's hearing testimony, he "thought" he told Attorney Greenwald that he had previously arrested petitioner. Hr'g Tr. 141:23–24. Attorney Greenwald conceded that he knew Matthews and Haumann recognized each other from a prior interaction. His failure to inquire into the circumstances of that prior interaction was objectively unreasonable. Similarly, his assertion that he first learned of the 1982 arrest after the Second Circuit remanded this § 2255 petition in 2012 is not credible. On November 22, 2006—after the conviction but before sentencing—Matthews filed a pro se motion seeking the assignment of new counsel. In this motion, he noted:

> Counsel made no efforts in getting another investigator, for current investigator (Richard Haumann) had conflict of interest with defendant. Defendant was arrested by this investigator when he worked as a detective for the Syracuse Police Dept., for a serious charge against one of his fellow officers. During the arrest, this investigator used a racial slur.

ECF No. 60, ¶ XV. Attached to this motion was a copy of a news article describing the 1982 arrest. Id., Ex. B.

In short, Attorney Greenwald's failure to inquire into the history between Matthews and Haumann, or his conscious decision to utilize Investigator Haumann's services anyway, was unreasonable and tainted the pre-trial investigation.[10]

---

[10] Attorney Greenwald had other options than Investigator Haumann. At the hearing, he noted that his office has, at times, borrowed an investigator from the Federal Public Defender's Office in Albany or hired an outside investigator.

## 2. Objectively Unreasonable Investigation

Whether due to bias or simply as a result of indifference or incompetence, the pre-trial investigation performed by Investigator Haumann and Attorney Greenwald was extremely deficient and unreasonable.[11]

An attorney's decision to pursue a specific alibi defense, much like the decision to call certain witnesses but not others, is a matter of trial strategy that is generally entitled to deference upon review. See Greiner v. Wells, 417 F.3d 305, 319–20 (2d Cir. 2005). However, if such strategic choices are made after less than complete investigation, they are only reasonable "to the extent that reasonable professional judgments support the limitations on investigation." Id. at 319 (internal quotation marks omitted).

The alibi defense presented by Attorney Greenwald focused only on the alleged actions by Matthews and Sewall after the Syracuse robbery. A review of the defense file shows that Investigator Haumann and Attorney Greenwald limited their investigation to the time period occurring after the robbery in an attempt to show Matthews could not have robbed the bank, driven around Syracuse as alleged by Valerie Sewall, and arrived at Joanne Vaughn's workplace before the news program ended at 12:30 p.m. While this is a viable theory of the defense case, there is no reasonable professional judgment to support the decision to limit the investigation to Matthews's post-robbery activity.

In fact, there was a wealth of information in the defense file that should have

---

[11] For example, in an August 8, 2006, memorandum related to his time study, Investigator Haumann cited Valerie Sewall's January 28, 2004, statement and noted: "Mr. [sic] Sewall said they left the bank in separate vehicles and drove to the parking lot of the Onondaga Hill Middle School where she says she picked up our client." Hr'g Ex. D-6. This directly conflicts with Valerie Sewall's statement, which indicates that they drove together in the blue sedan from the bank to the school parking lot where the white van was parked. Hr'g Ex. D-42. While this error does not skew the results of the time study, it reflects a general lack of knowledge of the facts of the case.

prompted further investigation into Matthews's location before the robbery began. A September 27, 2003, police report, authored by Detective J. Blumer, documents a conversation the detective had with Nathaniel Holloway, the owner of Holloway's garage. See Hr'g Ex. D-59. This report indicates that King Williams, who worked at the garage, told Holloway that he saw Matthews at the garage at approximately 11:25 a.m. on the day of the Syracuse robbery. In a September 30, 2003, statement to police, King Williams claimed that he observed Matthews at Holloway's garage at "around 11:30 a.m." Hr'g Ex. D-1. This is reflected in an October 1, 2003, police report, which noted: "Williams stated that a little after 1130 hrs. Matthews came back to the shop again in the van." Hr'g Exs. D-2, D-59.

Further, according to the notes of Detective Blumer, John Smith reported that Matthews returned to Holloway's garage at "11:30 / 11:45." Hr'g Ex. D-4. This account is documented in an October 5, 2003, police report, which reflected: "Smith admitted that around 1130 or 1145 hrs. Michael Matthews did come back to the shop at 521 South Ave." Hr'g Ex. D-44.

These estimates by King Williams and John Smith are entirely consistent with the two timelines prepared by Matthews, who estimated that he arrived back at Holloway's garage between 11:35 a.m. and 11:45 a.m. that day. This information becomes important in light of Valerie Sewall's police statement and her trial testimony. Sewall—the Government's key trial witness—reported that Matthews picked her up at her apartment on Delhi Street and drove to his apartment on East Kennedy Street to pick up the blue Toyota sedan. They proceeded to the school parking lot near the bank on Onondaga Hill, where Matthews changed into a disguise, and, finally, drove to the Fleet Bank on Seneca Turnpike. All of this had to have happened with enough time for Sewall to be caught on camera inside the bank at 11:49 a.m.

- 19 -

However, at the hearing, Gabriel Ramos testified that it took him thirty-eight minutes to traverse the route as described by Valerie Sewall.[12]  Thus, it would be impossible for Matthews to be at Holloway's garage at approximately 11:30 a.m., make the stops alleged by Sewall, and be in the parking lot of the Fleet Bank when Sewall is inside the bank at 11:49 a.m.

Despite being in possession of this possibly exculpatory information, neither Investigator Haumann nor Attorney Greenwald ever questioned King Williams or John Smith. Investigator Haumann's notes reflect his understanding that King Williams saw Matthews in the white van "at 11 something." Hr'g Ex. D-8. He never inquired further into the exact time. Nor did Investigator Haumann or Attorney Greenwald conduct a time study to determine whether it is possible to leave Holloway's garage at approximately 11:30 a.m., move about the city as described by Valerie Sewall, and arrive at the Fleet Bank on Seneca Turnpike by 11:49 a.m., only nineteen minutes later.

Attorney Greenwald failed to offer a reasonable justification for the failure to even speak with King Williams or John Smith. At the hearing, he explained that he did not investigate these potentially valuable alibi witnesses because parts of their statements to police were inconsistent with the accounts of other potential witnesses. He acknowledged that he simply relied on the police reports when making this determination and never independently questioned Williams or Smith. Investigator Haumann's excuse for not investigating these leads was simply that Attorney Greenwald had not instructed him to do so. Such poor investigation can only be due to a bias against Matthews or sheer indifference

---

[12]  The fact that Ramos stopped on West Kennedy Street instead of East Kennedy Street is not significant enough to dismiss his entire time study.

and incompetence.  Regardless of the reason, the failure to explore this avenue of an alibi
defense was objectively unreasonable.[13]

### 3. Prejudice

The jury never heard that King Williams told police he saw Michael Matthews at
Holloway's garage at approximately 11:30 a.m. on the day of the Syracuse robbery.  Nor did
the jury learn that John Smith told police he saw Matthews at the garage between 11:30 a.m.
and 11:45 a.m. that day.  Instead, on Smith's direct examination, the jury was informed that
Matthews left Holloway's between 11:00 a.m. and 11:10 a.m., which, if true, left time to be at
the bank at 11:49 a.m.  During his cross-examination, Attorney Greenwald never challenged
Smith on this timeline.  Nor did he show the jury that Smith had previously told police he saw
Matthews at the garage between 11:30 a.m. and 11:45 a.m., which, if true, left no time to be
at the bank at 11:49 a.m.

Presenting the evidence which placed Matthews at Holloway's garage around 11:30
a.m., coupled with a proper time study of the stops he allegedly made after leaving
Holloway's, may have led a jury to conclude that he could not have possibly been at the Fleet
Bank at 11:49 a.m. to participate in the Syracuse robbery.  This evidence, if presented at

---

[13] At the hearing and in his submissions, Matthews also argues that Attorney Greenwald's
representation was ineffective due to his failure to interview Cherry Love–Duncan or call her and Vee Harris
as witnesses at trial.  This argument is unpersuasive.  There is no credible evidence to establish that
Attorneys Secular or Greenwald could have learned, before trial, of Love–Duncan's claim that she was with
Matthews on the afternoon of the Syracuse robbery.  The only pertinent information she possessed prior to
trial related to Valerie Sewell's propensity to commit perjury when it is in her interest, an issue that was
addressed in detail on cross-examination at trial.  Similarly, the decision not to call Vee Harris was made by
Attorney Greenwald after meeting with her personally, investigating her version of the events and
background, and speaking with Matthews.  This decision amounts to trial strategy and is therefore entitled to
a measure of deference.  Finally, to the extent Matthews also claims Attorney Greenwald erred by not
investigating the actual height of Valerie Sewall's boyfriend, such is insufficient to establish ineffective
assistance of counsel.  In his closing argument, Attorney Greenwald specifically suggested that Sewall's
boyfriend, Kenneth Green, was the same height as Matthews and could have been the unidentified male
accomplice in the Syracuse robbery.  He also noted that one-third of the African–American population fit the
estimated height.

- 21 -

trial, together with the argument that Valerie Sewall may have named Matthews as her accomplice in the Syracuse robbery to protect her boyfriend, may very well have resulted in a different verdict on Count 2. Therefore, the objectively unreasonable investigation and trial examination described above was sufficient to undermine confidence in the outcome of the trial with respect to Count 2.

However, importantly, the ineffective assistance of counsel has absolutely no impact on Matthews's conviction on Count 1, which alleged a conspiracy to commit the Syracuse, Whitesboro, and Auburn robberies. All of the aforementioned evidence that an unbiased, competent investigator and defense attorney could have uncovered and presented to the jury relates to the Syracuse robbery only. Matthews pleaded guilty to the Whitesboro and Auburn robberies in state court prior to the trial in this federal case. Further, Valerie Sewall testified that she and Matthews drove around central New York casing banks in late-2002 and early-2003. She also identified petitioner as her accomplice in the Whitesboro and Auburn robberies, and the duo was apprehended as they fled the Auburn robbery. Moreover, Sewall identified a letter Matthews gave her which outlined a fictional version of the Auburn robbery in an attempt to cover-up the conspiracy after their arrest. All of this evidence and testimony was presented to the jury.

Even if Attorney Greenwald presented a sufficient alibi defense to negate the Government's case against Matthews with respect to the Syracuse robbery, there was more than sufficient evidence to establish an agreement between Matthews and Sewall to commit the Whitesboro and Auburn robberies as alleged in Count 1 of the superseding indictment. Therefore, his conviction on Count 1 stands independent of the ineffective assistance of counsel claim. See United States v. Coplan, 703 F.3d 46, 63 (2d Cir. 2012) ("[T]he lack of

- 22 -

sufficient evidence to support one of the objects of a multi-object conspiracy will not vitiate

the conspiracy conviction, where there is sufficient evidence to support another object."

(internal quotation marks and alterations omitted)), cert. denied, 134 S. Ct. 71 (2013). In

short, no amount of ineffective assistance of counsel regarding the circumstances of the

Syracuse robbery could have possibly caused a different outcome on Count 1. Matthews

does not argue otherwise.

Accordingly, Matthews's motion to vacate, set aside, or correct his sentence pursuant

to § 2255 will be granted only with respect to Count 2.

### B. Remedy

Where a court vacates and sets aside a judgment pursuant to § 2255, it shall also

"discharge the prisoner or resentence him or grant a new trial or correct the sentence as may

appear appropriate." 28 U.S.C. § 2255(b). As explained above, the ineffective assistance of

counsel only prejudiced Matthews on Count 2. His conviction for conspiracy in Count 1

remains. In its June 14, 2012, Order, the Second Circuit noted:

> Section 3559(c) provides, in pertinent part, that if a person "convicted in a
> court of the United States of a serious violent felony" has previously "been
> convicted (and those convictions have become final) on separate prior
> occasions in a court of the United States or of a State of . . . 2 or more serious
> violent felonies," that person, "[n]otwithstanding any other provision of law, . . .
> shall be sentenced to life imprisonment." 18 U.S.C. § 3559(c)(1)(A)(i). For
> purposes of this section, "'serious violent felony'" is defined to include "robbery
> (as described in section 2111, 2113, or 2118)" and "conspiracy . . . to commit
> any of the above offenses."   Id.  §   3559(c)(2)(F)(i).

Matthews, 682 F.3d at 182. Therefore, Matthews's conviction on Count 1 for conspiracy to

commit robbery, which remains untouched by the above decision, triggers a mandatory life

sentence in light of his multiple prior convictions. See United States v. Snype, 441 F.3d 119,

144 (2d Cir. 2006) ("Because the jury in this case found Snype guilty beyond a reasonable

doubt of conspiring to commit robbery in violation of § 2113, his instant crime plainly falls within the definition of serious violent felony . . . .").

In sum, petitioner Michael Matthews is entitled to have his conviction and sentence on Count 2 set aside. However, his conviction and sentence on Count 1 remains in full force and effect. Thus, his life sentence is unaltered. Indeed, he was sentenced to a term of life imprisonment "on each count to be served concurrently with each other." J. at 2.

## IV. **CONCLUSION**

The pre-trial investigation into Matthews's potential alibi for the Syracuse robbery was unquestionably tainted by bias and/or incompetence. It was woefully inadequate and objectively unreasonable. An unbiased and competent investigator and defense counsel could have uncovered relevant exculpatory evidence, which was readily available in the defense file. Had such evidence been presented to the jury, it is reasonably probable that the outcome of the trial would have been different with respect to Count 2. Therefore, Attorney Greenwald's overall performance amounted to ineffective assistance of counsel.

However, the ineffective assistance only impacts Count 2. Indeed, all of the evidence identified at the evidentiary hearing relates to the Syracuse robbery only. There was more than enough reliable direct evidence presented at trial to establish an agreement between Matthews and Valerie Sewall to plan and commit the Whitesboro and Auburn robberies. Thus, this decision has no effect upon Matthews's conviction for the conspiracy outlined in Count 1 of the superseding indictment. As he was sentenced to concurrent life sentences on both Counts 1 and 2, this decision has little practical consequence and he will remain in prison for life.

Therefore, it is

- 24 -

ORDERED that

1. Petitioner Michael Matthews's motion to vacate, set aside, or correct his sentence pursuant to § 2255 is GRANTED in part;

2. The conviction and sentence as to Count 1 of the superseding indictment remains in full force and effect; and

3. The conviction and sentence as to Count 2 of the superseding indictment is VACATED.

IT IS SO ORDERED.

United States District Judge

Dated: February 28, 2014
       Utica, New York.

- 25 -

10-0611-pr
Matthews v. USA

1            UNITED STATES COURT OF APPEALS

2                  FOR THE SECOND CIRCUIT

3                      - - - - - -

4                     August Term, 2011

5    (Argued: January 25, 2012              Decided:  June 14, 2012)

6                    Docket No. 10-0611-pr

7    _____

8    MICHAEL MATTHEWS,
9                              Petitioner-Appellant,

10                        - v. -

11   UNITED STATES OF AMERICA,

12                              Respondent-Appellee.
13   _____

14   Before:  KEARSE, CABRANES, and STRAUB, Circuit Judges.

15           Appeal from orders of the United States District Court for the Northern District of New

16   York, David N. Hurd, Judge, denying motion under 28 U.S.C. § 2255 to vacate petitioner's conviction

17   or correct his sentence of life imprisonment under the three-strikes provision of 18 U.S.C. § 3559(c).

18           Vacated in part, and remanded.

19           JESSE M. SIEGEL, New York, New York, for Petitioner-Appellant.

20           MICHAEL MATTHEWS, Petitioner-Appellant pro se, Pine Knot,
21           Kentucky, filed a supplemental brief.

22           BRENDA K. SANNES, Assistant United States Attorney, Syracuse,
23           New York (Richard S. Hartunian, United States Attorney for
24           the Northern District of New York, Edward R. Broton, Rajit S.
25           Dosanjh, Assistant United States Attorneys, Syracuse, New
26           York, on the brief), for Respondent-Appellee.

1    KEARSE, Circuit Judge:

2          Petitioner Michael Matthews, who received a sentence of life imprisonment as a career

3    offender pursuant to 18 U.S.C. § 3559(c) following his conviction in 2007 of federal bank robbery

4    and conspiracy offenses, appeals (1) from an order of the United States District Court for the Northern

5    District of New York, David N. Hurd, Judge, denying his motion under 28 U.S.C. § 2255 to vacate

6    his conviction or correct his sentence on the principal grounds that he was denied effective assistance

7    of trial counsel and appellate counsel, and (2) from the denial of his motion for reconsideration.

8    Matthews contends that the district court erred in denying his § 2255 motion without conducting a

9    hearing and without giving a meaningful explanation for its decision.  For the reasons that follow, we

10   conclude that the matter must be remanded to the district court for further proceedings on at least one

11   of Matthews's claims and for specification by the district court of the issue or issues as to which it

12   granted Matthews, without explanation, a certificate of appealability (or "COA") to seek review of

13   its denial of his § 2255 motion.


14                                I. BACKGROUND


15         Matthews has a history of convictions for robbery and burglary offenses dating back

16   at least to 1971, when he was convicted of first-degree robbery in violation of N.Y. Penal Law

17   § 160.15 and two counts of second-degree burglary in violation of N.Y. Penal Law § 140.25, resulting

18   in a state-court youthful offender adjudication.  His § 2255 motion focuses principally on his most

19   recent convictions and their relationship to his past troubles with the law.


2

1    A. Matthews's Most Recent Convictions

2            In 2006, in a superseding federal indictment, Matthews was charged with one count

3    of bank robbery, in violation of 18 U.S.C. § 2113(a), and one count of conspiracy to commit bank

4    robbery, in violation of 18 U.S.C. § 371 ("the 2006 charges"). The government filed an "Enhanced

5    Penalty Information" alleging that Matthews had previously been convicted of several serious violent

6    felonies; that his record included convictions in 1983 on two counts of first-degree robbery in

7    violation of N.Y. Penal Law § 160.15, and convictions in 1996 of bank robbery in violation of 18

8    U.S.C. §§ 2113(a) and (b), and conspiracy to commit bank robbery in violation of 18 U.S.C. § 371;

9    and that, on the 2006 charges, the government would therefore seek enhanced punishment for

10   Matthews under the three-strikes provision of 18 U.S.C. § 3559(c).

11           Section 3559(c) provides, in pertinent part, that if a person "convicted in a court of the

12   United States of a serious violent felony" has previously "been convicted (and those convictions have

13   become final) on separate prior occasions in a court of the United States or of a State of . . . 2 or more

14   serious violent felonies," that person, "[n]otwithstanding any other provision of law, . . . shall be

15   sentenced to life imprisonment." 18 U.S.C. § 3559(c)(1)(A)(i). For purposes of this section, "'serious

16   violent felony'" is defined to include "robbery (as described in section 2111, 2113, or 2118)" and

17   "conspiracy . . . to commit any of the above offenses." Id. § 3559(c)(2)(F)(i). See also United States

18   v. Snype, 441 F.3d 119, 144 (2d Cir. 2006) ("Snype") (because the New York Penal Law "statutory

19   elements" of robbery, including "§ 160.15," "parallel those required to establish robbery under 18

20   U.S.C. §§ 2111, 2113(a), and 2118(a), . . . New York State convictions for first and second degree

21   robbery by definition qualify as serious violent felonies under § 3559(c)(2)(F)(i)").

3

1                    At a jury trial in September 2006, at which Matthews was represented by James F.

2    Greenwald of the Office of the Federal Public Defender, Matthews was found guilty of the 2006

3    charges. In 2007, the district court found, over defense objections, that Matthews had previously been

4    convicted of at least two serious violent felony offenses, and it sentenced him to, inter alia, concurrent

5    terms of life imprisonment. On direct appeal, for which Matthews was represented by new counsel,

6    his conviction and sentence were affirmed. See United States v. Matthews, 545 F.3d 223, 225 (2d Cir.

7    2008) (noting People v. Matthews, 68 N.Y.2d 118, 123, 506 N.Y.S.2d 149 (1986) (which had

8    affirmed Matthews's first set of adult convictions), and United States v. Matthews, 20 F.3d 538,

9    553-55 (2d Cir. 1994) (which had affirmed his second set of adult convictions)).


10    B. Matthews's § 2255 Motion

11                  In March 2009, Matthews, proceeding pro se, filed the § 2255 motion that is the

12    subject of the present appeal, asserting four claims. He alleged principally that he was denied

13    effective assistance of counsel ("IAC") at trial because Greenwald had hired, as an investigator to

14    assist in Matthews's defense, a former police officer with whom Greenwald knew Matthews "had a

15    prior negative relationship" (Matthews § 2255 Motion at 5). The motion alleged that the investigator,

16    Richard Haumann, had been a deputy police chief in Syracuse, New York, and that he had "arrested

17    . . . [and] viciously assaulted" Matthews and addressed Matthews "with racial disdain and

18    insensitivity" at a time when Matthews was accused of the attempted murder of a police officer. (Id.)

19    The motion alleged that due to the conflict of interest stemming from this history, Haumann and

20    Greenwald failed to conduct an adequate investigation into possible defenses for Matthews against

21    the 2006 charges.

1        The other claims asserted in Matthews's § 2255 motion were that he was denied
2   effective assistance of counsel on his direct appeal because his new attorney had, inter alia, failed to
3   communicate with him and to raise meritorious issues on appeal, including the IAC allegations against
4   trial counsel, of which she was aware; that the district court lacked jurisdiction to enhance his
5   sentence under § 3559(c) because the court did not ascertain that Matthews's predicate crimes were
6   violent or that the predicate convictions were final; and that his life sentences violated the Eighth
7   Amendment's prohibition against cruel and unusual punishment.

8        The § 2255 motion requested a hearing, a determination of the relief to which
9   Matthews was entitled on these claims, and/or a reduction of his sentence.  Matthews also made
10  several requests that the court furnish him with trial and hearing transcripts and/or appoint counsel
11  to represent him in connection with the motion.  Those motions were denied.  However, the district
12  court instructed the government to file a response to Matthews's § 2255 motion and stated that the
13  matter would be taken on submission.

14       The government, in its opposition to Matthews's § 2255 motion, submitted a
15  memorandum arguing that his claims should be rejected for a variety of reasons.  As to the claim of
16  ineffective assistance of trial counsel, the government argued (a) that Matthews failed to prove
17  deficient performance as required by Strickland v. Washington, 466 U.S. 668 (1984), in that his
18  allegations were "general," "cursory," "vague," and lacking in reference to specific incidents that
19  might substantiate his claim of conflict between himself and the investigator hired by trial counsel,
20  and (b) that Matthews failed to prove the prejudice element of the Strickland test because, given the
21  district court's description of the trial evidence as to Matthews's guilt as overwhelming, Matthews
22  could not show a reasonable probability that but for deficient performance on the part of his attorney

1   the outcome of his trial would have been different.  (Government Memorandum in Opposition to

2   Petitioner's Motion Pursuant to 28 U.S.C. § 2255 ("Government Memorandum") at 7-9.)  As to the

3   claim of ineffective assistance of appellate counsel, the government argued (a) that counsel had

4   simply made a "cho[ice] to advance stronger arguments on appeal and eliminate weaker ones" (id.

5   at 12) and that her choice thus did not amount to constitutionally deficient performance (see id.

6   at 10-12), and (b) that other arguments against application of the career offender statute would not

7   have been proper issues for appeal because they had not been raised in the district court (see id. at 10).

8         The government opposed Matthews's claim that the district court lacked jurisdiction

9   to impose a life sentence under § 3559(c)(1)(A)(i) on the grounds (a) that that claim was procedurally

10  barred because Matthews had not raised it on direct appeal from his conviction, and (b) that the claim

11  lacked merit because the district court had properly determined, based on adequately supported

12  findings, that § 3559(c) was applicable based on Matthews's prior commission of at least two serious

13  violent felonies.  (See id. at 12-15.)

14        As to Matthews's Eighth Amendment claim, the government argued (a) that the claim

15  was procedurally barred because Matthews failed to raise it on direct appeal, and (b) that it lacked

16  merit in light of this Court's decision in Snype, 441 F.3d at 152 (holding that a life sentence pursuant

17  to § 3559(c) does not constitute cruel and unusual punishment).  (See Government Memorandum

18  at 15-16.)

19        After the government filed its memorandum, Matthews requested and received leave

20  to amend his motion.  However, the May 13, 2009 order granting that permission instructed that any

21  amendment be filed on or before July 17; no amendment was filed.

1          By Order dated July 22, 2009 ("July 2009 Order"), the district court denied Matthews's

2    § 2255 motion, stating as follows:

3          On March 23, 2009, the petitioner/defendant filed a motion pursuant
4    to 28 U.S.C. § 2255 to vacate, set aside, or correct his conviction of September
5    11, 2006, and judgment of February 22, 2007.  (Docket No. 95)[.]  The
6    Government filed a memorandum in opposition.  (Docket No. 100).  The
7    petitioner/defendant's request for permission to amend the original petition
8    (Docket No. 101) was granted on May 13, 2009.  (Docket No. 102).  The
9    petitioner/defendant failed to file an amendment by the due date of July 17,
10    2009.

11          Upon a review of the submissions and for all of the reasons set forth in
12    the Government's memorandum, it is

13          ORDERED, that the petitioner/defendant's motion pursuant to 28
14    U.S.C. § 2255 is DENIED.

15    July 2009 Order at 1-2.

16          Matthews moved for reconsideration of the July 2009 Order, stating that he had

17    informed the court that he would be unable to comply with the July 17 deadline for amendment and

18    that the clerk of the court had indicated to him that the transcripts he had requested would be

19    forthcoming. Matthews contended that his § 2255 motion should not have been denied without giving

20    him additional time. The motion for reconsideration was summarily denied. See District Court Order

21    dated September 11, 2009.

22          Matthews thereafter applied to the district court for a certificate of appealability to

23    challenge the denials of his § 2255 motion and his motion for reconsideration.  In an order dated

24    December 17, 2009 ("December 2009 Order"), the court granted the COA, stating only as follows:

25          On September 21, 2009, the petitioner filed an Application for
26    Certificate of Appealability (Docket No. 107) for the denial of his motion
27    pursuant to 28 U.S.C. [§] 2255 to vacate his conviction (Docket No. 103), and
28    for reconsideration (Docket No. 106).  The Government has not opposed.

1          Therefore, it is

2                ORDERED that a Certificate of Appealability is GRANTED.

3                IT IS SO ORDERED.

4     December 2009 Order at 1-2.


5                              II. DISCUSSION


6                On this appeal, represented by new counsel appointed by this Court in June 2010,

7     Matthews argues principally that the district court abused its discretion in denying his § 2255 motion

8     without an evidentiary hearing and "without any findings or conclusions other than the statement that

9     [the denial] was 'for all of the reasons set forth in the Government's memorandum'" (Matthews brief

10    on appeal at 5 (quoting July 2009 Order)).   He asks that we remand to the district court with

11    instructions (a) to appoint counsel to assist him, (b) to allow him to amend his § 2255 motion and

12    respond to the Government Memorandum, and (c) "once the record is fully and fairly developed," to

13    make "findings and conclusions consistent with the requirements of" § 2255.   (Matthews brief on

14    appeal at 15.)   For the reasons that follow, we vacate the July 2009 Order to the extent that it

15    summarily rejected Matthews's claim of ineffective assistance of trial counsel due to the alleged

16    conflict of interest of the investigator hired by counsel.   We remand for further proceedings on that

17    claim, as well as for identification by the district court of any other issues as to which its December

18    2009 Order was meant to grant a certificate of appealability.

1     A. <u>The Specificity Requirement for an Order Granting a COA</u>

2          The federal habeas appeals statute, as amended by the Antiterrorism and Effective

3     Death Penalty Act of 1996 ("AEDPA"), provides that "[u]nless a circuit justice or judge issues a

4     certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order

5     in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1)(B).   Notwithstanding § 2253(c)'s

6     reference to a "circuit justice or judge" as the potential issuer of a COA, a district judge too has

7     authority to grant a COA.  <u>See, e.g.</u>, <u>Soto v. United States</u>, 185 F.3d 48, 51 n.3 (2d Cir. 1999)

8     ("<u>Soto</u>"); <u>Lozada v. United States</u>, 107 F.3d 1011, 1014-16 (2d Cir. 1997), <u>abrogated on other grounds</u>

9     <u>by</u> <u>United States v. Perez</u>, 129 F.3d 255, 260 (2d Cir. 1997), <u>cert. denied</u>, 525 U.S. 953 (1998).

10          AEDPA provides that the COA may be granted "only if the applicant has made a

11     substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  It requires the

12     judge, in granting a COA, "to indicate the 'specific issue or issues' that satisfy the 'substantial showing

13     of the denial of a constitutional right' standard."  <u>Blackman v. Ercole</u>, 661 F.3d 161, 164 (2d Cir.

14     2011) ("<u>Blackman</u>") (quoting 28 U.S.C. §§ 2253(c)(2) and (3)).

15          Our decision in <u>Blackman</u> (which was issued more than a year after the district court's

16     grant of the COA in the present case) noted that the specificity requirement is "a threshold procedural

17     requirement designed to 'avoid[] the waste of judicial energy on the consideration of clearly meritless

18     claims,'" <u>Blackman</u>, 661 F.3d at 164 (quoting <u>Grotto v. Herbert</u>, 316 F.3d 198, 209 (2d Cir. 2003));

19     <u>see, e.g.</u>, <u>Blackman</u>, 661 F.3d at 164 ("Appellate courts cannot waste scarce judicial resources by

20     wading through trial records in an effort to guess which issues a district judge may have deemed

21     worthy of appellate review.").  In <u>Blackman</u>, in which the district court had granted a COA without

22     identifying the issue or issues on which it was granted, we remanded for the required specification.

1          In the present case, the problem discussed in <u>Blackman</u> is exacerbated by the fact that

2    the district court, in denying Matthews's § 2255 motion, did not provide any explanation for its denial

3    except to state that it adopted "all of the reasons set forth in the Government's memorandum" in

4    opposition to the motion, July 2009 Order at 2--and the fact that the reasons advanced by the

5    government for the rejection of one of Matthews's complaints about trial counsel were plainly flawed

6    (<u>see</u> Part II.B. below).

7          Nonetheless, because we do not view the district court's failure to comply with the

8    specificity requirement as a flaw that is jurisdictional, given (a) that we have ruled that a "certificate

9    of appealability issued without meeting the 'substantial showing of the denial of a constitutional right'

10   requirement nonetheless suffices to confer appellate jurisdiction," <u>Soto</u>, 185 F.3d at 52 (quoting

11   § 2253(c)(2)), and (b) that this Court itself is authorized to grant a certificate of appealability, we

12   proceed to address the issue that this Court would have viewed as facially appropriate for the issuance

13   of a COA. If the district court in fact viewed Matthews as having met the substantial-showing-of-the-

14   denial-of-a-constitutional-right standard with respect to any other issue, that court will be free on

15   remand to identify such issue or issues and to grant a new COA following the proceedings on remand.


16   B. <u>The Biased-Investigator IAC Claim</u>

17          Section 2255 provides, <u>inter alia</u>, that a federal prisoner claiming that he was

18   imprisoned in violation of federal law "may move the court which imposed . . . sentence [on him] to

19   vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). It also provides that

20          [u]nless the motion and the files and records of the case **conclusively**
21          show that the prisoner **is entitled to no relief**, the court shall cause notice

1          thereof to be served upon the United States attorney, grant a prompt hearing
2          thereon. determine the issues and make findings of fact and conclusions of law
3          with respect thereto.

4  Id. § 2255(b) (emphases added).

5          "We review the district court's denial of a hearing under 28 U.S.C. § 2255 for abuse

6  of discretion." Chang v. United States, 250 F.3d 79, 82 (2d Cir. 2001). "A district court abuses its

7  discretion when its decision rests on an error of law or a clearly erroneous factual finding, or when

8  its decision, though not necessarily the product of legal error or a clearly erroneous finding of fact,

9  cannot be located within the range of permissible decisions." United States v. Gonzalez, 647 F.3d 41,

10  57 (2d Cir. 2011). And "[w]hile the district court has wide discretion in developing the record it will

11  use to determine a habeas petition, that discretion does not extend to summary dismissals of petitions

12  presenting facially valid claims and off-the-record interactions with trial counsel." Pham v. United

13  States, 317 F.3d 178, 185 (2d Cir. 2003).

14          In assessing a claim that the habeas petitioner has been denied the effective assistance

15  of counsel to which he is entitled under the Sixth Amendment, the court applies the standard

16  established by Strickland v. Washington, 466 U.S. 668. Under that standard, the petitioner

17          must meet a two-pronged test: (1) he "must show that counsel's performance
18          was deficient," 466 U.S. at 687, so deficient that, "in light of all the
19          circumstances, the identified acts or omissions were outside the wide range of
20          professionally competent assistance," id. at 690; and (2) he must show "that the
21          deficient performance prejudiced the defense," id. at 687, in the sense that
22          "there is a reasonable probability that, but for counsel's unprofessional errors,
23          the result of the proceeding would have been different," id. at 694.

24  Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011). With respect to the performance prong, the

25  Strickland Court noted that

26          counsel has a duty to make reasonable investigations or to make a reasonable
27          decision that makes particular investigations unnecessary.   In any

1    ineffectiveness case, a particular decision not to investigate must be directly
2    assessed for reasonableness in all the circumstances, applying a heavy measure
3    of deference to counsel's judgments.

4    466 U.S. at 691; see id. at 688 ("the performance inquiry must be whether counsel's assistance was

5    reasonable considering all the circumstances").

6    Matthews's principal claim--which we refer to as the biased-investigator IAC claim--

7    was that his trial counsel rendered ineffective assistance by insisting on using Haumann as the

8    investigator to assist in the preparation of Matthews's defense against the 2006 charges despite

9    knowing that Haumann and Matthews had had a relationship that was surely adversarial.   The

10   government opposed this claim on the grounds (a) that Matthews could not satisfy the performance

11   prong of Strickland because his allegations as to the conflict between himself and the investigator--

12   based on the fact that "the investigator . . . arrested Matthews 27 years ago when the investigator was

13   a Syracuse police officer" (Government Memorandum at 6)--were "general," "cursory," "vague," and

14   "unsubstantiated" (id. at 8), and "ma[de] no specific allegation evidencing a conflict" (id. at 6); and

15   (b) that Matthews could not satisfy Strickland's requirement that he show that use of the allegedly

16   biased investigator caused him prejudice because

17       [i]n an order issued after trial denying Matthews' first request to have his
18       attorney replaced due to ineffective assistance, the Court stated:

19           [T]he evidence of defendant's guilt was overwhelming.   Even if
20           defendant's present complaints about his attorney are true, it would
21           have made no difference in the outcome of the trial.

22   Doc. Number 58.

23   (Government Memorandum at 9.)

24   These arguments by the government did not warrant the denial of Matthews's biased-

25   investigator IAC claim without a hearing.  Looking first at the basis for the government's argument

12

1    for lack of prejudice, we note that the government acknowledges in its brief on this appeal that the

2    district court's statement that the evidence was overwhelming was made in the context of a motion

3    seeking new counsel but "not in response to a motion alleging ineffective assistance of counsel"

4    (Government brief on appeal at 21 n.13). Further, "Doc. Number 58," in which the district court

5    described the evidence against Matthews as overwhelming, was an order entered by the district court

6    on October 3, 2006. So far as the record before us reveals, Matthews did not introduce his biased-

7    investigator IAC claim until November 22, 2006. In sum, the court's statement that the evidence

8    against Matthews was overwhelming does not appear to have been part of a <u>Strickland</u> analysis, much

9    less one undertaken in the context of the claim that is at issue here.

10          Further, as to the performance prong of the <u>Strickland</u> standard, Matthews's stated basis

11    for his claim that Haumann would have a negative interest in assisting Matthews's defense was

12    anything but vague, unsubstantiated, or unspecific. His § 2255 motion alleged that Haumann, when

13    he was deputy chief of police in Syracuse, had, <u>inter alia</u>, arrested, assaulted, and racially demeaned

14    Matthews, when Matthews was charged with the attempted murder of a police officer. That arrest was

15    a subject of Matthews's November 2006 IAC motion, and his supporting affirmation, made under

16    penalty of perjury (<u>see</u> Matthews November 7, 2006 Affirmation)--which the government has

17    reproduced in its appendix on this appeal--appended as Exhibit B a photocopy of a December 1982

18    newspaper article headlined "Released Shooting Suspect Nabbed in Early Morning Stakeout." The

19    article reported, <u>inter alia</u>, that Matthews had been arrested some three months earlier on charges of

20    armed robbery and the attempted murder of a police officer who tried to stop him after the robbery,

21    that Matthews had then been released from custody inadvertently and become a fugitive, and that he

22    had just been recaptured. Three months of Syracuse police stakeouts--and a manhunt joined by "[t]he

13

1    FBI, state police, and several out-of-state metropolitan police departments"--had followed Matthews's

2    inadvertent release.  Just after 1 a.m. in the final stakeout, Matthews ("disguised in a wig and granny

3    glasses") was "tackled," "pull[ed] . . . to the ground," and "taken into custody" by two policemen,

4    including "Deputy Police Chief Richard L. Haumann."  The article stated that "[t]he arrest capped

5    what Police Chief Thomas J. Sardino called 'one of the most extensive manhunts in the City's

6    history.'"

7              Although a conflict of interest or an inferable bias on the part of a person on whom the

8    attorney relies for information in formulating a defense does not mean that the attorney himself has

9    a conflict of interest, the record plainly reveals a plausible basis for an inference that Haumann could

10   reasonably be expected to bear animus against Matthews.  Matthews's attorney's reliance on such a

11   person while knowing of that person's presumable bias would call into question whether counsel had

12   performed his "duty to make reasonable investigations," Strickland, 466 U.S. at 691 (emphasis added).

13             The government argues that "Matthews fails to present any evidence that, if a conflict

14   existed between himself and the investigator, that his counsel was aware of it."  (Government brief

15   on appeal at 21.)  A handwritten note at the bottom of the Matthews Affirmation's Exhibit B included

16   the statement that "Counsel was advised that there would be a conflict of interest in having this

17   investigator (Richard L. Haumman [sic]) work on my case, racial remarks during the arrest by this

18   investigator who was a deputy police chief during this arrest of defendant."  Although the court has

19   discretion as to the methods it will use to develop the record needed to rule on a habeas petition, we

20   do not see that it could properly summarily resolve against Matthews the matter of whether his

21   off-the-record communications with Greenwald had made Greenwald aware of the potential bias of

22   Haumann.

1          In sum, the government's responses to Matthews's § 2255 motion were inadequate to

2    show that his biased-investigator IAC claim could not meet the Strickland standard, and the district

3    court's rejection of this claim by adopting the government's arguments was likewise inadequate.

4          We conclude that Matthews should have an opportunity to show what an unbiased

5    investigator could have unearthed in order to create a reasonable probability that the result of the trial

6    would have been different.


7                                        CONCLUSION

8          For the above reasons, we vacate so much of the July 2009 Order as summarily

9    rejected Matthews's biased-investigator IAC claim and we remand to the district court for further

10   proceedings on this claim, including such proceedings as may be necessary for the court to determine

11   whether to appoint counsel to represent Matthews in connection with this claim.

12         Matthews has filed a pro se supplemental brief on appeal, arguing the merits of other

13   issues as well. We decline to address issues other than the biased-investigator IAC claim at this time.

14   If the district court intended its December 2009 Order to grant a COA with respect to any other issue,

15   the court should, following the proceedings on remand, grant a new COA identifying such issue or

16   issues.